## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Aware Daud, Khadija Jama, Abdiaziz Ali Abdi, Sahra Farah, Anab Ibrahim, Fowsiya Gelle, Kiin Farah, Lul Esse Hersi, Kasha Anna Sobiana, Waris Barre, Issak Horor, and the Equal Employment Opportunity Commission,** | **Civ. No. 06-4013 (JJG)** |
| **Plaintiffs,** | |
| **v.** | **O R D E R** |
| **Gold'n Plump Poultry, Inc. and The Work Connection, Inc.,** | |
| **Defendants.** | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for an Award of Attorneys' Fees, Costs, and Expenses to Class Counsel (Doc. No. 186), and on the request of the Equal Employment Opportunity Commission for final approval of two consent decrees. All parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). For the reasons set forth below, the Court approves the class action settlement, the consent decrees, and the request for fees and costs.

## I.      FINDINGS OF FACT

### A.      Background and Procedural History

1.      This case was commenced as a putative class action by Plaintiffs and proposed class representatives Aware Daud, Khadija Jama, Abdiaziz Ali Abdi, Sahra Farah, Anab

Ibrahim, Fowsiya Gelle, Kiin Farah, Lul Esse Hersi, and Kasha Anna Sobania on October 6, 2006.  Waris Barre and Issak Horor were later added to the caption as Plaintiffs and proposed class representatives.  Together, these eleven individuals are known as the "Daud Named Plaintiffs."

2.      Defendant Gold'n Plump Poultry, Inc. ("Gold'n Plump") is a poultry processor with facilities in Cold Spring, Minnesota, and Arcadia, Wisconsin.  Gold'n Plump employed the Daud Named Plaintiffs as production workers at its processing facilities.

3.      The Work Connection, Inc. ("TWC") is a privately held, temporary employment agency.  Gold'n Plump hired TWC to screen, hire, and employ workers, including some of the Daud Named Plaintiffs, to work at Gold'n Plump.

4.      Ten of the eleven Daud Named Plaintiffs are Somali Muslims.

5.      The Islamic religion requires its followers to pray at least five times a day.  The time for the five obligatory prayers changes depending on the location of the sun and the individual's geographic location.  For example, the Fajr prayer, primarily at issue in this litigation, must generally occur between dawn and sunrise.  So in 2009, based on the geographic location of Gold'n Plump's facility in Cold Spring, Minnesota, Fajr can begin as early at 3:30 a.m. and as late as 6:29 a.m., depending on the time of year.

6.      Gold'n Plump's processing facilities are subject to strict regulations governing food and worker safety.  Some of these regulations mandate specific break times.  For example, the United States Department of Agriculture requires that lunch occur during the fifth operating hour of each shift.  The State of Minnesota requires a rest break during the first four hours of work.  Other regulations require Gold'n Plump to keep its poultry products at or below a certain temperature and to complete the processing within a certain amount of time.

7.      Gold'n Plump initially developed a floating break policy to accommodate the prayer beliefs of its Muslim employees while meeting the logistical challenges of running a poultry processing facility.  Not every Muslim employee's position qualified him or her to take a floating break, however, and the floating break policy proved to be inefficient and costly to Gold'n Plump.

8.      Seeking to achieve a reasonable accommodation with respect to the prayer break policy, and to rectify other alleged unlawful employment practices concerning racial and religious discrimination, the Daud Named Plaintiffs brought suit against Gold'n Plump.

9.      The Daud Named Plaintiffs also sued TWC for religious discrimination, alleging that TWC had not provided job applicants and employees with a reasonable accommodation for handling pork.

10.     For almost two years, the parties engaged in extensive pretrial discovery.  They exchanged hundreds of thousands of pages of written discovery, retained experts, deposed dozens of witnesses, met with leaders of the Somali Muslim community, and inspected Gold'n Plump's facilities.  The parties exchanged sufficient information to reliably assess the merits of the claims and defenses in this case.

11.     Although the Equal Employment Opportunity Commission ("EEOC") did not independently serve any discovery in this litigation, it obtained and reviewed the information produced and conducted its own administrative investigations of the charges filed against Gold'n Plump and TWC.  The EEOC had sufficient information to accurately evaluate its case against TWC and Gold'n Plump.

12.     The Daud Named Plaintiffs believed they obtained strong evidence during discovery that Gold'n Plump had engaged in numerous acts of religious discrimination and had

failed to reasonably accommodate its Muslim employees' requests for prayer breaks.  Gold'n Plump, on the other hand, vigorously denied discriminating against its employees or denying reasonable religious accommodations, and it developed evidence that the accommodations sought by the Daud Named Plaintiffs would be costly and inefficient.

13.     The Daud Named Plaintiffs' case against TWC was founded on the legal argument that a temporary employment agency could not require a job applicant to waive his or her right to a reasonable religious accommodation before placement with an employer.  TWC was resolute in its defense that it had offered Muslim job applicants placement with other employers where handling pork was not an issue.

14.     It is beyond dispute that this case was contentious and controversial from the start. The parties disagreed emphatically on almost every issue, and they only became further entrenched in their respective positions as discovery progressed.  It was against this backdrop that the parties began discussing a settlement.

### B.     The Proposed Settlement

15.     Prior to the court-ordered settlement conference on August 27, 2008, the parties engaged in several private mediation sessions with the Honorable Jonathan G. Lebedoff, United States Magistrate Judge for the District of Minnesota, now retired.  Although the parties made substantial progress, no settlement was reached.

16.     On August 27, 2008, certain Daud Named Plaintiffs, counsel for the Daud Named Plaintiff, Somali community leaders, the EEOC, Gold'n Plump, and TWC participated in a settlement conference with both Magistrate Judge Lebedoff and this Court.  Two Somali interpreters were also present.

17.     Both this Court and Magistrate Judge Lebedoff were apprised of the financial conditions of TWC and Gold'n Plump during the settlement negotiations.

18.     Counsel for the Daud Named Plaintiffs and the EEOC also had some knowledge of the financial conditions of TWC and Gold'n Plump.  Counsel for the Daud Named Plaintiffs knew that a large adverse judgment had recently been awarded against Gold'n Plump in another case, and that Gold'n Plump's financial condition had been weakened by increased feed and energy costs.  Counsel thought that TWC would not have sufficient assets to pay a significant verdict due to its status as a privately-held company operating in a service industry.

19.     A major factor motivating TWC and Gold'n Plump to settle was the adverse effect of litigation costs on their insurance policy limits.  Both Gold'n Plump and TWC had liability insurance for the types of claims asserted in this case, but the policies contained provisions that reduced the amount of money available to pay a judgment as litigation expenses increased.  Thus, as litigation proceeded, the assets of TWC and Gold'n Plump were increasingly exposed.  Furthermore, TWC's and Gold'n Plump's attorneys' fees were being paid from the same pool of insurance money that was potentially available to pay a judgment, and further litigation would have continually eroded this fund.

20.     Another important motivation for Gold'n Plump to settle was to bring peace and normalcy to the workplace.

21.     Plaintiffs' primary motivation to settle was to implement an acceptable prayer break policy and enjoin future religious discrimination.

22.     Despite holding widely divergent positions based on seemingly incompatible cultural and economic considerations, the parties reached a proposed, global settlement at the settlement conference on August 27, 2008, and stated the material terms on the record.  The

terms of the proposed settlement were interpreted for and approved by the Daud Named Plaintiffs.

23.     As contemplated by the settlement negotiations and as a condition precedent to final approval of the settlement, the EEOC filed two separate cases: *EEOC v. Gold'n Plump Poultry, Inc.*, Civ. No. 08-5136, and *EEOC v. The Work Connection, Inc.*, Civ. No. 08-5137. Both cases were filed on September 8, 2008.

24.     This Court held a hearing on October 15, 2008, on disputed issues concerning the proposed settlement.  The parties were instructed to continue their discussions and to provide updates to the Court.

25.     The Daud Named Plaintiffs, Gold'n Plump, and TWC entered into a written, proposed settlement agreement on November 3, 2008.

26.     Key provisions of the proposed settlement included the following.  Gold'n Plump agreed to accommodate Muslim Dhuhr and Fajr prayers by providing a ten-minute, paid prayer break for employees working in the second processing unit, for both the day and night shifts. The prayer breaks will be scheduled during the windows of time for the Fajr and Dhuhr prayers, as set by islamicfinder.org.  To minimize disruption to the production line, Gold'n Plump is authorized to determine the exact break time during the window.  Gold'n Plump will pay $215,000 and TWC will pay $150,000 in monetary relief.  The EEOC has sole responsibility for allocating the money to the settlement class members.  TWC and Gold'n Plump will pay no more than $985,000 in attorneys' fees to counsel for the settlement class.  Class members will release all claims that could have been brought in this case or are related in any way to the claims pled in the Amended Complaint, including claims concerning Muslim holidays.

27.     Another term of the proposed settlement was the parties' consent to the exercise of jurisdiction by this Court pursuant to 28 U.S.C. § 636(c)(1).   The parties subsequently executed a written consent to jurisdiction.

28.     There was no evidence of collusion at any point during the settlement negotiations, and all negotiations were conducted at arms-length.

**C.     This Court's Order of November 7, 2008**

29.     Consistent with the proposed settlement agreement, this Court entered an Order on November 7, 2008, certifying a class for settlement purposes, preliminarily approving the settlement, approving the forms and methods of notice of the settlement to members of the class, and setting a hearing date for final approval of the settlement.

30.     With respect to certification, the Court found that the settlement class was readily ascertainable and that members of the class were so numerous that joinder would be impracticable.   As such, Federal Rule of Civil Procedure 23(a)(1) was satisfied.   Rule 23(a)(2) was satisfied because one or more questions of fact or law were common to the settlement class. The Daud Named Plaintiffs' claims were typical of the claims of the settlement class, thereby fulfilling Rule 23(a)(3).   Rule 23(a)(4) was satisfied because the Daud Named Plaintiffs would fairly and adequately protect the interests of the settlement class, in that the interests and claims of the Daud Named Plaintiffs were consistent with those of the settlement class; there were no conflicts between the Daud Named Plaintiffs and the settlement class; and the Daud Named Plaintiffs and members of the settlement class were represented by qualified counsel experienced in preparing and prosecuting complex class actions.   Finally, Rule 23(b)(2) was fulfilled because final equitable relief was appropriate regarding the class as a whole, and the proposed settlement provided current and future employees with a reasonable accommodation for prayer.

31.    The Court appointed Larson King, LLP and Zimmerman Reed, PLLP as class counsel ("Daud Class Counsel") because they were capable of fairly and adequately representing the interests of the settlement class, had done extensive work identifying and investigating the claims in the case, were experienced at handling class actions and similar complex cases, were knowledgeable of the applicable law, and had committed the necessary resources to represent the settlement class.  Accordingly, Rule 23(g) was satisfied.

32.    The Court appointed the Daud Named Plaintiffs as the class representatives for the settlement class.

33.    Based on the above findings, the Court certified a class under Rule 23(a) and (b)(2), solely for the purpose of settlement and without an adjudication on the merits ("Daud Settlement Class").  The class was defined as:

> All former, current, and future Muslim, hourly, nonexempt production line employees of Gold'n Plump or TWC who have worked, now work, or in the future work in live receiving, evisceration, and second processing at Gold'n Plump's poultry processing facilities in Cold Spring, Minnesota or Arcadia, Wisconsin (the "Facilities") at any time between September 1, 2005 and September 1, 2011, and all former, current, and future Muslim applicants for those positions through Gold'n Plump or TWC at any time between September 1, 2005 through September 1, 2011.

(Order at 4-5, Nov. 7, 2008.)

34.    The Court also preliminarily approved the terms of the settlement agreement and ordered the settlement to be submitted to the Daud Settlement Class members for their consideration.

35.    The Order mandated the procedure by which members of the Daud Settlement Class could file objections to the fairness, reasonableness, and adequacy of the proposed settlement; to any term of the settlement agreement; or to the proposed award of attorneys' fees and expenses.  The objector was required to file the objection with the Court and include his or

8

her name, address, telephone number, dates of employment, position held, and the specific ground for the objection. The deadline for filing objections with the Court was February 6, 2009. Untimely objections were explicitly barred.

36.     The Court stayed the case pending final approval of the proposed settlement.

**D.     Notice of the Proposed Settlement and the Claims Process**

37.     The EEOC mailed Somali-language notices of the settlement and claims process to 953 Daud Settlement Class members on November 17, 2008, followed by English-language versions on November 24, 2008. Recipients were instructed that the enclosed claim forms had to be returned and postmarked by December 19, 2008. The EEOC also published notices of the settlement and claims process on November 21 and 28, and December 5, 2008, in the St. Cloud Times, as well as in the December edition of the Warsan Times, which is a Somali-language newspaper published in Minneapolis, Minnesota. All mailed and published notices were translated into Somali.

38.     The EEOC received 147 completed claim forms. Fourteen were rejected as untimely because they were postmarked after December 19, 2008. Ten were rejected based on information provided in the forms, such as the claimant was not Muslim, had suffered no adverse action, or had not been employed by Gold'n Plump.

39.     The EEOC calculated the proposed monetary distributions and sent notices to the Daud Settlement Class members on January 13, 2009. The notices informed the claimants they had until February 6, 2009, to file objections to the proposed allocations. This date was later extended to March 5, 2009, but only for objections to the EEOC's proposed distribution of money.

### E.  The Consent Decrees

40.     On December 1, 2008, the Court signed consent decrees, which were also signed by counsel for all parties, in *EEOC v. Gold'n Plump Poultry, Inc.*, Civ. No. 08-5136 ("Gold'n Plump Consent Decree"), and *EEOC v. The Work Connection, Inc.*, Civ. No. 08-5137 ("TWC Consent Decree").

41.     The Gold'n Plump and TWC Consent Decrees mandated several forms of equitable relief, the most significant of which will be summarized here.  TWC and Gold'n Plump are prohibited from discriminating on the basis of religion in violation of Title VII in hiring, assigning, promoting, testing, disciplining, discharging, or terminating employees or job applicants.  TWC and Gold'n Plump must not retaliate against employees or applicants who oppose unlawful acts under Title VII or who participate in proceedings under Title VII.  TWC and Gold'n Plump will provide reasonable accommodation for its employees' and applicants' sincerely held religious beliefs to the extent required by Title VII.

42.     Particular to Gold'n Plump is the following requirement to reasonably accommodate the religious practices of Muslim employees with respect to daily prayers.

> In addition to receiving other breaks and lunch breaks as otherwise required by law, such employees in second processing shall be afforded a ten minute break in the second one-half of the shift[,] which . . . shall be scheduled so as to accommodate the daily Muslim schedule for prayer.  Employees in first processing shall be permitted to transfer to secondary processing in order to accommodate their practices with respect to daily prayers.

(Gold'n Plump Consent Decree at 6, Dec. 1, 2008.)

43.     Specific to TWC is a prohibition on adopting or enforcing any policy adopted by a client under which job applicants or employees must declare in advance that they do not have a right to a reasonable accommodation.  TWC is also enjoined from adopting or enforcing a client's policy that (1) prohibits an individual who has been disciplined from obtaining a

reasonable accommodation under Title VII, or (2) declares an individual on probationary status ineligible for a reasonable accommodation under Title VII.

44.     With respect to monetary relief, Gold'n Plump will pay $215,000 to Daud Settlement Class members.  The EEOC will allocate this money in accordance with four categories defined in the Gold'n Plump Consent Decree.  The individuals who filed charges of discrimination with the EEOC will each receive $8,000.  The six individuals who refused to handle pork will share an additional $7,500, to be divided equally.  The remaining $119,500 will be distributed based on factors such as whether a claimant timely filed a claim form, received a written warning or final corrective action, was terminated for praying during an emergency bathroom break or unscheduled absence, or was denied an accommodation for a sincerely held religious belief.

45.     In accordance with the TWC Consent Decree, TWC will pay $150,000 to Daud Settlement Class members, which the EEOC will allocate to three categories of applicants and employees.  Individuals who filed EEOC charges will receive $5,802 each.  Twenty-three other individuals named in Exhibit B to the TWC Consent Decree will each receive $4,878.  Four individuals named in Exhibit C to the TWC Consent Decree will each receive $5,100.

46.     The Gold'n Plump Consent Decree established a detailed claims procedure, which the EEOC followed.  The EEOC mailed notice of the proposed settlement to each potential Daud Settlement Class member, who was instructed to return the attached claim form within thirty days in order to receive a monetary distribution.  After receiving the claim forms, the EEOC determined for each Daud Settlement Class member his or her proposed share of the settlement amount.  The EEOC then notified each individual Daud Settlement Class member of his or her proposed allocation of monetary relief and of the right to file objections to the Gold'n Plump

Consent Decree.  The deadline for objections to be postmarked was February 6, 2009.  This date was later extended to March 5, 2009, but only for objections to the EEOC's proposed monetary distributions.

47.     There was no claims procedure established by the TWC Consent Decree because all twenty-eight individuals who were eligible to recover had been identified during the settlement negotiations.  The EEOC simply determined the proposed distribution amounts and gave notice to the proper individuals.

48.     The Gold'n Plump and TWC Consent Decrees constituted the full and final resolution of the EEOC's claims against Gold'n Plump and TWC.

**F.     Objections to the Consent Decrees**

49.     There were no objections to the TWC Consent Decree.

50.     According to the Court's docket, two Daud Settlement Class members filed objections to the Gold'n Plump Consent Decree.  Nasro Mohamed Hashi objected to the EEOC's determination that he did not qualify for a monetary distribution because he failed to timely return his claim form.  His claim form was postmarked on December 24, 2008, five days after the December 19, 2008 deadline.  Nasro Said Omar objected to his proposed distribution of $750.

**G.     Objections to the Proposed Settlement**

51.     According to the Court's docket, twenty-six Daud Settlement Class members timely filed objections to the proposed settlement.  Those individuals are Hibaq Abdi, Abdi-haye Osman Hanshi, Mohamad Yusuf Ahmed, Daud D. Roble (a/k/a Roble Daud Dakane), Balos Yusuf, Nimo Omar, Farhia Yusuf, Amina Arale, Mariam Mohamed, Sahro Moalin, Ayan M. Salah, Saida Mohamud Hassan, Khadra Omar, Amina Sugule, Asho Yusuf, Hindo Dubat (a/k/a

Hinda Dubat), Fartun Diriye, Maryan Guhad (a/k/a Maryun H. Guhad), Bashaal Mahamed Hussein, Farah Ade Mohamed, Ahmed Noor Sahal, Hussein Yusuf (a/k/a Mohamed H. Yusuf), Ahmed Hassan Arte, and Asli Adan.  The vast majority of these objections were presented on a pre-printed form containing signature lines for employees or former employees wishing to object. These objectors asserted that (1) the negotiated prayer break did not coincide with the optimal Muslim prayer schedule; (2) the EEOC's proposed monetary distributions were not equivalent to their lost wages; (3) they had not received compensation for religious discrimination; and (4) Gold'n Plump refused to give them an employment reference.[1]

52.     On March 2, 2009, Jay W. Ramos, Esq., filed a document captioned "Objections of 28," purportedly on behalf of twenty-eight Daud Settlement Class members, although only twenty-seven individuals are named on an attached chart.  Mr. Ramos objected primarily to the new prayer break policy, but he also questioned the total monetary amount of the settlement and the lack of an opt-out provision.  As a factual matter, the Court finds that the objections presented by Mr. Ramos are untimely because they do not relate to the EEOC's proposed monetary distributions.  In the interest of providing a complete record, however, the Court will address Mr. Ramos' arguments in the Conclusions of Law section below.

**H.     Consolidation of the Three Actions**

53.     On January 21, 2009, *EEOC v. Gold'n Plump Poultry, Inc.*, Civ. No. 08-5136, and *EEOC v. The Work Connection, Inc.*, Civ. No. 08-5137, were consolidated into *Daud v. Gold'n Plump Poultry, Inc.*, Civ. No. 06-4013, for the purposes of settlement.  The EEOC actions were closed, and only the *Daud* case remains open.

---

[1]     Asli Adan also raised other "objections," which are not relevant to the terms of the proposed settlement or consent decrees, such as the denial of unemployment benefits.  Those objections are summarily rejected.

### I.     The Fairness Hearing on March 16, 2009

54.    The Court held a fairness hearing on March 16, 2009.  No objector spoke at the hearing.

55.    Mr. Ramos spoke on behalf of approximately twenty-eight objectors.  He repeated some of his earlier written points and made some new arguments.  Briefly stated, Mr. Ramos opposed certification of the class, challenged the fairness of the settlement, asserted that class members who did not comply with the claims process should be able to file individual suits against TWC and Gold'n Plump, argued that the settlement agreement did not accurately reflect the material terms of the settlement, characterized the interests of the Daud Named Plaintiffs as incongruent with those of other class members because they no longer worked for Gold'n Plump, faulted the settlement agreement for not containing an interpreter affidavit, accused counsel of collusion during the settlement negotiations, and asserted that no Somali community leaders were involved with the settlement negotiations.

56.    As with Mr. Ramos' written filings, the Court finds that the new objections asserted at the hearing were untimely but, in the interest of developing a full record, will discuss them below.

### J.     Attorneys' Fees, Costs, and Expenses

57.    Daud Class Counsel has spent approximately 4,770 hours on this litigation as of March 4, 2009, resulting in a lodestar amount of $1,660,730.75.  Daud Class Counsel has also incurred $162,333.48 in unreimbursed costs and attorneys' fees.

58.    As part of the settlement, TWC and Gold'n Plump agreed to pay an amount not to exceed $985,000 to Daud Class Counsel.

59.     The costs and fees will be paid separately from the monetary awards, and no Daud Settlement Class member's share will be reduced due to the payment of attorneys' fees and costs.

60.     No Defendant or Daud Settlement Class member objected to the amount of fees and expenses requested.

## II.      CONCLUSIONS OF LAW

61.     The form, content, and method of dissemination of the settlement notice given to the Daud Settlement Class complied with the requirements of Federal Rule of Civil Procedure 23(e)(1) and due process, was reasonably calculated to give all interested parties notice of the settlement, and adequately advised them of their rights to object.  *See* Fed. R. Civ. P. 23(e)(1); *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).

62.     For purposes of the settlement of this case, and without an adjudication on the merits, the Court concludes that the requirements of Federal Rule of Civil Procedure 23 remain satisfied as to the Daud Settlement Class, as determined in this Court's Order of November 7, 2008, and summarized above.  The Court therefore grants final certification of this case as a class action for settlement purposes.  *See* Fed. R. Civ. P. 23(a)(1)-(4), (b)(2).

63.     The Daud Named Plaintiffs have fairly and adequately represented the interests of the Daud Settlement Class.  Inherent in this conclusion is the determination that the interests of the Daud Named Plaintiffs are not incompatible with the interests of the Daud Settlement Class simply because they no longer work at Gold'n Plump.  Notably, none of Mr. Ramos' clients are currently employed by Gold'n Plump, and no current employee filed an objection to the new prayer break policy.

64.     Daud Class Counsel has acted in the best interests of the Daud Settlement Class as a whole.  *See In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 706 (E.D. Mo. 2002).  Daud Class Counsel achieved significant equitable and injunctive relief for Muslim employees working at Gold'n Plump or applying for employment through TWC, as well as monetary relief.

65.     Judicial approval is required for settlement of a class action.  Fed. R. Civ. P. 23(e).  A court may approve a class settlement only if "it is fair, reasonable, and adequate."  *Id.* 23(e)(2).

66.     The EEOC sued TWC and Gold'n Plump pursuant to its own enforcement power, not Rule 23, and thus there is no requirement that the consent decrees be judicially approved as adequate, fair, and reasonable.  *See Binker v. Pennsylvania*, 977 F.2d 738, 747 (3d Cir. 1992).  Nevertheless, the EEOC has agreed to be bound by this Court's determination regarding fairness, adequacy, and reasonableness, and the EEOC shall be bound by this Order.

67.     Four factors are relevant to whether a settlement is adequate, fair, and reasonable: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement."  *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)).

68.     The merits of this case were vigorously disputed, and the parties purposely chose not to comment on the merits in the settlement or the consent decrees.  Accordingly, even though the Court must balance the merits of this case against the settlement terms, the Court will not reach any final conclusions on the merits.  *See Grunin*, 513 F.2d at 123 (citations omitted); *EEOC v. McDonnell Douglas Corp.*, 894 F. Supp. 1329, 1334 (E.D. Mo. 1995).

69.     Suffice it to say, the claims of the Daud Settlement Class have some merit, as do the defenses of Gold'n Plump and TWC.  There is controversy, and strong opinions, on both sides of this dispute, and the terms of the settlement provide a good balance between the competing positions.  With regard to the monetary aspect of the settlement, Gold'n Plump and TWC will pay a total of $365,000 to the Daud Settlement Class members.  This amount is neither too low nor too high.  It "strikes a reasonable balance between, on the one hand, the hypothetically significant but risky benefits of litigation, and on the other, the certain and immediate benefits of the class-wide relief."  *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 446 (S.D. Iowa 2001) (citation omitted).

70.     More importantly, Gold'n Plump will provide additional, paid prayer breaks for the Daud Settlement Class members.  The prayer accommodation was the very heart of this case, and its value cannot be quantified in dollars.  Attaining the additional prayer breaks was a significant outcome for the Daud Settlement Class.

71.     Any discussion of the merits would not be complete without mention of the Eighth Circuit's decision in *Sturgill v. United Parcel Service*, 512 F.3d 1024 (8th Cir. 2008), which was issued during the settlement negotiations.  The court in *Sturgill* rejected a jury instruction that described an accommodation as reasonable "if it *eliminates* the conflict between Plaintiff's religious beliefs and Defendant's work requirements."  *Id.* at 1030 (emphasis in original).  The court explained, "reasonable depends on the totality of the circumstances and therefore might, or might not, require elimination of a particular, fact-specific conflict."  *Id.*  In other words, a reasonable accommodation does not have to eliminate all conflicts between religion and work.  *Id.* at 1032.  Although the Court reaches no ultimate conclusions on the effect

of *Sturgill* to this case, *Sturgill* certainly strengthened Gold'n Plump's position during the negotiations.

72.     Turning to financial considerations, the eroding insurance coverage limits and uncertain fiscal conditions of Defendants weigh in favor of concluding that the settlement is reasonable, fair, and adequate.  Continued litigation would have exposed the Daud Settlement Class to increasing risk as the availability of insurance funds dwindled.  Daud Class Counsel was concerned that TWC and Gold'n Plump might not have sufficient assets to pay a substantial monetary judgment.  The Court concludes that the settlement is proportionate to the financial situations of TWC and Gold'n Plump.

73.     Further litigation would be complex and expensive, which also favors approval of the settlement.  This case is almost three years old, and the parties estimate it would take several more years to end absent a settlement.  In addition, the three cases—consolidated only for the purpose of settlement—would likely proceed separately, multiplying the complexity and expense of additional litigation.  Finally, the benefits obtained by the settlement and consent decrees could be significantly diluted, or even lost, before the conclusion of a trial and an appeal.  *See Officers for Justice v. Civ. Serv. Comm'n*, 688 F.2d 615, 629 (9th Cir. 1982).  The proposed settlement provides the Daud Settlement Class a prompt, economical, and advantageous religious accommodation, as well as monetary compensation, while avoiding the expenses and uncertainty of a lengthy and complex trial.

74.     Other than the two organized campaigns of objections, there is relatively little opposition to the settlement.  Of 953 notices mailed and 129 claim forms returned, only 26 objections were properly and timely filed.  Even if there had been a significant percentage of objections, however, a court may approve a settlement that is nevertheless fair, reasonable, and

adequate.  *See Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988) (approving a settlement despite objections from 180 of the approximately 400 class members).

75.     The largest category of objectors expressed concern that the new prayer break will not occur at the ideal time for prayer, which they described as between thirty and forty-five minutes after dawn.  Because the timing of the Fajr prayer is based on the rising of the sun, this window of time changes practically every day.  Correspondingly, the morning prayer break time would have to be changed approximately biweekly in order to meet the demands of the objectors.  Moving the window throughout the year, however, would present disruptive and expensive production challenges to Gold'n Plump.  As a compromise, therefore, the parties agreed that the prayer breaks will be scheduled during an accepted window for Muslim prayer, as set by islamicfinder.org.  This compromise reasonably accommodates the prayer practices of Muslim employees while minimizing the economic and efficiency costs to Gold'n Plump.  In contrast, the objectors to the timing of the new prayer breaks seek to eliminate every conflict between work demands and religious beliefs, which is not required by the law.  *See Sturgill*, 512 F.3d at 1032.  The Court concludes that these objections do not affect the fairness, reasonableness, or adequacy of the settlement.

76.     A few objections concern fairness to particular individuals rather than to the award as a whole.  These objectors include claimants who did not comply with the requirements of the claims process, claimants who failed to meet required deadlines, and claimants who believe their individual relief is insufficient or unfair.  Having reviewed the objections, the Court concludes that none of these objections affect the fairness, adequacy, or reasonableness of the settlement.  No individual objector has explained why he or she could not have complied with the claims process or was prevented from meeting deadlines.  Nor has any individual objector

shown that his or her individual loss warrants disapproval of the entire settlement. *See McDonnell Douglas Corp.*, 894 F. Supp. at 1335; *see also Officers for Justice*, 688 F.2d at 628 ("Undoubtedly, the amount of the individual shares will be less than what some class members feel they deserve but, conversely, more than the defendants feel those individuals are entitled to. This is precisely the stuff from which  negotiated settlements are made.").

77.    Another category of objections consists of challenges to the aggregate amount of the settlement.  As stated above, however, the monetary amount fairly reflects the financial conditions of Defendants and is proportionate to the merits of the claims in this case. Additionally, "where monetary relief is but one form of the relief requested," the Court must examine "the complete package taken as a whole, rather than the individual component parts . . . for overall fairness." *See Officers for Justice*, 688 F.2d at 628.  The focus of this case has always been to redress the alleged discrimination against Somali Muslim employees, and the value of the equitable and injunctive relief obtained to this end is immeasurable.  Considering the entire package of relief obtained in the settlement, the objections to the aggregate monetary amount are not well-founded.

78.    Two Daud Settlement Class members have expressed concern that the settlement will preclude their respective pending charges of pregnancy discrimination and disability discrimination.  The Court concludes, however, that the terms of the settlement agreement and consent decrees do not preclude claims unrelated to those asserted in this action.

79.    Some objectors have asserted that Gold'n Plump is refusing to give them employment references.  These objections do not relate to the claims in this case or to the terms of the settlement, and they are rejected.  In addition, Gold'n Plump explained that it does not provide employment references for production employees, and no objector has shown otherwise.

80.     Turning now to Mr. Ramos' arguments, even though they are untimely, the Court will engage in some discussion of substance so as to eliminate any doubt that the settlement in this case is fair, reasonable, and adequate.

81.     The Court begins with Mr. Ramos' assertion of collusion, for which Mr. Ramos has provided absolutely no support, only mere speculation.  But the simple fact that adversaries were able to negotiate a settlement acceptable to all parties does not inexorably amount to collusion.  Rather, the lengthy and contentious negotiations were hard-fought and conducted at arms-length at all times.  The Court is not willing to interfere with such an extensively and carefully negotiated settlement.  *See McDonnell Douglas Corp.*, 894 F. Supp. at 1333-34.

82.     Mr. Ramos has suggested that the settlement agreement does not accurately reflect the material terms negotiated by the parties.  It is true that although a global settlement was reached at the August 27, 2008 settlement conference, and the terms stated orally on the record, the parties continued to negotiate several disputed issues before entering into the final, written settlement agreement on November 3, 2008.  However, Mr. Ramos has not identified any material discrepancy, nor has he identified any provision to which all parties failed to agree.  The Court concludes that the written settlement agreement accurately reflects the material terms to which the parties agreed on August 27, 2008.

83.     As for Mr. Ramos' challenge to the settlement because there is no interpreter's affidavit attached to the settlement agreement, it is undisputed that an interpreter attended the settlement conference and interpreted the terms of the settlement for the Somali-speaking attendees.  Furthermore, the Court has found that the Daud Named Plaintiffs understood the terms of the settlement and agreed to those terms.  This objection is flatly without merit.

84.     Mr. Ramos' assertion that no Somali community or religious leaders participated in the settlement of this case is also inaccurate.   Even before the court-ordered settlement conference, an EEOC attorney and Daud Class Counsel met with Somali elders from the St. Cloud community on April 28, 2008 and explained the proposed prayer break accommodation, the details of which became the basis for the settlement agreement and the Gold'n Plump Consent Decree.   Leaders from the St. Cloud Somali community also attended the settlement negotiations.   These leaders later told the EEOC that the settlement was a good accommodation for Muslims, and while not the perfect result, was a positive step.

85.     Mr. Ramos' final objection of note is that the settlement agreement should include an opt-out provision.   This case was certified as a class action under Rule 23(b)(2), however, which does not require such a provision to protect the interests of the class.   The inclusion of incidental monetary relief in the settlement does not change the nature of this Rule 23(b)(2) class action, which sought and will receive predominantly equitable relief.   *Cf. In re Tex. Prison Litig.*, 191 F.R.D. 164, 179 (W.D. Mo. 1999) (citations omitted).

86.     Two final considerations pertaining to the fairness, adequacy, and reasonableness of the settlement bear mention.   First, Daud Class Counsel and the EEOC agree that the settlement is fair, adequate, and reasonable.   This opinion is entitled to substantial weight.   *See Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996); *McDonnell Douglas Corp.*, 894 F. Supp. at 1335.   Second, the Court invited the Daud Named Plaintiffs and Somali community leaders to participate in the settlement conference.   Their respectful and insightful participation was key to reaching this hard-won settlement.

87.     Based on the above, the Court concludes that the settlement of this case is fair, reasonable, and adequate.   The settlement results in a *reasonable* accommodation for the Daud

Settlement Class's Muslim prayer practices.  Moreover, it provides injunctive and equitable relief.  Even though the settlement does not provide all the relief desired by certain individual class members, "reasonable" does not mean ideal, perfect, or in satisfaction of each individual's wishes.  The Court grants final approval to the settlement.

88.     The Court also concludes, in light of the above, that the TWC Consent Decree is fair, reasonable, and adequate, and the TWC Consent Decree is also approved.

89.     As to the Gold'n Plump Consent Decree, the Court rejects the objections from Mr. Hashi and Mr. Omar.  The postmark on Mr. Hashi's envelope supports the EEOC's position that he did not timely file his claim form and is therefore not eligible to receive a monetary award under the Gold'n Plump Consent Decree.  Mr. Omar's objection to his proposed monetary compensation is rejected because he has not shown that the EEOC's formula used to calculate individual monetary awards was unfair, unreasonable, or inadequate.  To the contrary, the Court concludes that the EEOC's proposed monetary allocations fairly, reasonably, and adequately balance the different interests of the class members.

90.     Consequently, the Court concludes that the Gold'n Plump Consent Decree is fair, reasonable, and adequate, and it is approved.  The Court also approves the EEOC's proposed monetary distributions.

91.     The Court next approves Daud Class Counsel's request for $985,000 in attorneys' fees and costs.  No one has objected to the amount of fees.  The parties agreed to that amount in the settlement agreement, and the Court gives substantial deference to such an agreement.  *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) (citations omitted).  Although the award is nearly three times the amount of the monetary settlement, this comparison cannot be the basis for assessing the reasonableness of the fees because the significance of the equitable and

injunctive relief cannot be quantified in terms of dollars.  *See Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1392 (8th Cir. 1990).  The efforts of Daud Class Counsel were "indispensable to this measure of success."  *See id.*  Given the significant amount of work performed by the Daud Class Counsel in the past two and a half years, the amount of risk involved, and the benefits obtained by the Daud Settlement Class, the amount of fees requested is reasonable.

## III.    ORDER

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

92.    The stay in this case is lifted.

93.    Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for an Award of Attorneys' Fees, Costs, and Expenses to Class Counsel (Doc. No. 186) is **GRANTED**.

94.    The request of the EEOC for final approval of the consent decree with Gold'n Plump (Doc. No. 6 in Civ. No. 08-5136) is **GRANTED**, and the parties are ordered to abide by the terms of that decree.

95.    The request of the EEOC for final approval of the consent decree with TWC (Doc. No. 7 in Civ. No. 08-5137) is **GRANTED**, and the parties are ordered to abide by the terms of that decree.

96.    TWC must pay claimants in accordance with the terms of the TWC Consent Decree.

97.    Gold'n Plump must pay claimants in accordance with the terms of the Gold'n Plump Consent Decree and the EEOC's allocations for monetary relief.

98.     The accommodation plan described in the settlement agreement is reasonable.  In particular, the equitable relief detailed in paragraph 3 of the settlement agreement (Doc. No. 156-3 in Civ. No. 06-4013) provides the Daud Settlement Class members with reasonable accommodation for the ritual prayer practices of their Muslim religion in accordance with Title VII, the Minnesota Human Rights Act, and the Wisconsin Fair Employment Law.  Gold'n Plump and TWC need not accommodate the Daud Settlement Class members' Muslim ritual prayer practices beyond the requirements of the settlement agreement and consent decrees, and failure to provide accommodation of the Daud Settlement Class members' Muslim prayer practices beyond the terms of the settlement agreement and consent decrees will not violate Title VII, the Minnesota Human Rights Act, or the Wisconsin Fair Employment Law.

99.     The Daud Named Plaintiffs and all Daud Settlement Class members are bound by the release of claims, as set forth in paragraph 9 of the settlement agreement (Doc. No. 156-3 in Civ. No. 06-4013).

100.     The Daud Named Plaintiffs and all Daud Settlement Class members are permanently enjoined from commencing or prosecuting any action asserting any of the settled claims against any of the Released Parties, as those terms are defined in paragraph 9 of the settlement agreement (Doc. No. 156-3 in Civ. No. 06-4013).  Any person or entity who knowingly violates this injunction shall pay the costs and attorneys' fees incurred by Gold'n Plump, TWC, or any other released party as a result of the violation.[2]

---

[2]     Daud Class Counsel included the second sentence of paragraph 100 in the Daud Named Plaintiffs' proposed order for final approval.  Although this penalty is not included in the settlement agreement or consent decrees, no party objected to the proposed provision, and the Court will therefore include it.

101.    Daud Class Counsel is awarded reimbursement of expenses, disbursements, and costs, including expert fees, mediator fees, court reporter fees, translation fees, and attorneys' fees, in the amount of $985,000.

102.    This action is **DISMISED WITH PREJUDICE.**

103.    The Court shall retain jurisdiction over the construction, interpretation, implementation, and enforcement of the settlement agreement until the three-year term of the Gold'n Plump consent decree expires.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated this 31st day of March, 2009.

   s/ *Jeanne J. Graham*_____
JEANNE J. GRAHAM
United States Magistrate Judge